AUSA Corey B. Rubenstein, (312) 353-8880

**FILED**
8/23/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**UNDER SEAL**

In the Matter of the Search of:

The X Corp. account Twitter Account ID 174392125; Username @liawrencelepard, further described in Attachment A

Case No. 23 M 825

Ref. No. 2023R00231

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Keith Hennings, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of California, there is now concealed:

**See Attachment A, Part III**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | wire fraud |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

_____
*Applicant's Signature*

KEITH HENNINGS, Special Agent
Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: August 23, 2023

_____
*Magistrate Judge's signature*

City and State: Chicago, Illinois

Jeffrey I. Cummings, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT     )
                                        )
NORTHERN DISTRICT OF ILLINOIS    )

## **AFFIDAVIT**

I, Keith Hennings, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately August 2009.

2.      As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crime, including mail, wire, and bank fraud, and money laundering. In addition, I have received specialized training regarding the investigation of various financial offenses, assisted in such investigations, and am familiar with the types of transactions conducted by those involved in illegal activities to disguise and conceal the nature of their dealings as well as their efforts to hide the proceeds generated from these illegal activities to avoid law enforcement detection. I have also received specialized training regarding cryptocurrencies and their use in criminal offenses. I have been a member of the FBI's Evidence Response Team since December 2018, and as such, have received additional training on search techniques and executing search warrants. I have participated in the execution of multiple federal search warrants.

3.      This affidavit is made in support of an application for a warrant to search, pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), for information associated with certain account(s) that are stored at the premises owned, maintained, controlled, or operated by X Corp., a social network

provider located at 1355 Market Street, Suite 900, San Francisco, California 94103. The account to be searched is Twitter Account ID 174392125; Username @liawrencelepard (the "**Subject Account 1**"), which is further described in the following paragraphs and in Part II of Attachment A. As set forth below, there is probable cause to believe that in the account, described in Part II of Attachment A, in the possession of X Corp., there exists evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (the "**Subject Offenses**").

4.    The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of Title 18, United States Code, Section 1343, are located in **Subject Account 1**.

## I.    BACKGROUND INFORMATION

### A.    Twitter

5.    Based on my training and experience and information available from Twitter (twitter.com),[1] I have learned the following about X Corp. and Twitter.

---

[1] The information in this section is based on information published by Twitter on its website, including, but not limited to, the following document and webpages: "Guidelines for law enforcement," available at https://help.twitter.com/en/rules-and-policies/twitter-law-

6.     X Corp. owns and operates Twitter, a social networking and microblogging service that can be accessed at http://www.twitter.com and via the Twitter mobile application ("app"). Generally, Twitter allows users to register and create an account; to personalize (if desired) an account profile page; and to send and receive communications via the platform. These functionalities are discussed in more detail below.

7.     Twitter permits its users to communicate via messages that can contain photos, videos, links, and/or a maximum of 280 characters of text. Users can choose to share these messages, called "Tweets," with the public or, alternatively, to "protect" their Tweets by making them viewable by only a preapproved list of "followers."  Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Users can also Tweet a copy of other Tweets ("retweet") or Tweet a reply to another Tweet. Users can also indicate that they like a Tweet by clicking on a heart icon that appears next to each Tweet on the platform.

8.     Twitter also permits its users to exchange private messages, known as "direct messages" or "DMs," with other Twitter users. DMs, which also may include photos, videos, links, and/or text, can only be viewed by the sender and designated recipient(s). Direct messages may be sent to an individual user or to a group of up to 50 Twitter users. Twitter users have the ability to choose whether they can receive a direct message from anyone. At any time, a Twitter user has the ability to alter the

---

enforcement-support, "Using Twitter," available at https://help.twitter.com/en/using-twitter, and "New user FAQ," available at https://help.twitter.com/en/new-user-faq.

settings on their Twitter account so that they can receive direct messages only from (1) individuals to whom the user has already sent a direct message and (2) Twitter accounts that the user "follows" via his account.

9.      While individuals are not required to register with Twitter to view the content of unprotected Tweets, individuals must register for a Twitter account to send Tweets, to "follow" accounts in order to view protected Tweets, and to send and receive DMs. A user may register for an account for free by visiting Twitter's website or via the Twitter app. When a user creates a new Twitter account, Twitter assigns that account a unique user ID ("UID"). A user must also select a password as well as a unique Twitter username (also known as a "handle"). Twitter then appends the @ symbol in front of whatever username the user selects to create the Twitter username (for example: @example). The user may also select a different name (the "display name"), which is not automatically preceded by the @ symbol, to be displayed on his profile picture and at the top of his Tweets alongside his Twitter username. The display name can include symbols similar to emojis. The user can change their password, username, and/or display name at any time, but the UID for the account will remain constant.

10.     While anyone can sign up and use Twitter for free, as of November 2021 Twitter also offered a subscription model that offered users access to additional features and app customizations. This new subscription is called Twitter Blue. A user can sign up for Twitter Blue at any time. Twitter Blue allows a user to make changes to published tweets, allows users to turn on an "Undo Tweet" feature which keeps a

tweet private during a set Tweet Undo period of between 5 and 60 seconds, or until the user taps "Send now."

11.     At the time of Twitter account creation, X Corp. asks the user for certain identity and contact information, including: (1) name; (2) email address and/or telephone number; and (3) month and year of birth. X Corp. also keeps certain information relating to the creation of each Twitter account, including: (1) the date and time at which the user's account was created; and (2) the method of account creation (e.g., website or Twitter app).

12.     Upon the creation of a Twitter account, a generic profile page is automatically created for the user. This page displays information including (1) the user's Twitter username; (2) the display name; (3) the number of Twitter accounts the user is following; (4) the number of Twitter accounts that are following the user; and (5) Tweets sent by the user (although, as noted above, if the user has chosen to protect their Tweets they will be visible only to preapproved "followers"). The user can personalize this page by posting a personal picture or image (known as an "avatar") to appear on the page and/or a banner image to appear across the top of the profile page. The user can also add text to create a short biography, to identify his location, to provide a link to his website, or to specify his date of birth.

13.     As noted above, Twitter users can use their account to send and receive communications. If a Tweet includes a Twitter username that is preceded by the @ symbol, that is referred to as a "mention."  The Twitter user mentioned in the Tweet

will receive a notification informing them that they have been mentioned and showing the content of that Tweet. Similarly, if another Twitter user replies to a Tweet sent by a user, the user who sent the original Tweet will receive a notification that someone replied to their message, and the notification will show the content of that reply.

14.     Twitter users can also include links to webpages in their Tweets and Direct Messages. Twitter automatically processes and shortens links provided by the user to a shortened link that starts http://t.co/. Twitter tracks how many times these shortened links are clicked.

15.     A registered Twitter user can also "like" a Tweet by clicking a heart icon on a Tweet sent by another user. If another user "likes" a Tweet that is posted by the Twitter user, a notification will appear in the user's account identifying what Tweet was liked and who liked it.

16.     As noted above, users can include photographs, images, and videos in their Tweets. Each account has a "media timeline" on their profile that displays "the photos, videos, and GIF's [the accountholder] has uploaded with [their] Tweets." An individual can view a Twitter user's media timeline by visiting the user's Twitter profile page.

17.     Twitter users can also opt to Tweet with their location attached. This functionality is turned off by default, so Twitter users must opt-in to utilize it. However, if a Twitter user enables Twitter to access their precise location information, the Twitter user will have the option of attaching their location (e.g., the name of a city

or neighborhood) to a Tweet at the time it is sent. If the user uses Twitter's in-app camera to attach a photo or video to the Tweet while the functionality is enabled, the Tweet will include both the location label (e.g., the name of a city or neighborhood) of the user's choice as well as the device's precise location in the form of latitude-longitude coordinates. The user can turn this functionality off (thereby removing their location from their Tweets) at any time, and they can delete their past location data from Tweets that have already been sent.

18.     A Twitter user may choose to "follow" another Twitter user. If a Twitter account is unprotected (i.e., privacy settings have not been enabled), the user can follow another user simply by clicking the "follow" button on the other user's Twitter profile page. If a Twitter account is protected (i.e., privacy settings have been enabled), the user can follow another user by clicking the "follow" button and waiting for the other user to approve their request. Once an account is followed by a Twitter user, the Tweets posted by the account the user follows will appear in the user's Twitter Home timeline. Every time a Twitter user follows another account, Twitter sends a notification to the account being followed to inform them about the new follower. Each user's Twitter profile page includes a list of the people who are following that user and a list of people whom that user follows. Twitter users can "unfollow" other users whom they previously followed at any time. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may

find interesting based on the types of accounts that the user is already following and who those people follow.

19.     A Twitter user can also "block" other Twitter users. This prevents the blocked account from contacting or following the user or from seeing the user's Tweets. Twitter does not notify the user of a blocked account when another Twitter account blocks them.

20.     A Twitter user can also use Twitter's integrated search function. When a user types a search term into Twitter's search tool, it will return results that include accounts, Tweets, and photos that match that search term. Twitter users using the service via the Twitter mobile app also have the option of saving searches that they have performed. A user can delete such saved searches at any time.

21.     A Twitter user can also join or create "Lists" of other Twitter accounts. These Lists often organize Twitter accounts by group, topic, or interest. Viewing a timeline of a specific List will show you a stream of Tweets made only by accounts that are on that List. Users can pin their favorite lists to their Twitter Home timeline page. Twitter users have the ability to remove their accounts from Lists upon which it may appear.

22.     Twitter also offers a functionality called "Spaces," which it calls "a new way to have audio conversations on Twitter." Any user can create a Space; that user is referred to as the "host." Spaces are public, so anyone can join and listen to the conversation within a Space once it is created, although a user can send another

Twitter user a link to their Space and invite them to join. By default, the only individuals permitted to speak in a Space are the individuals that the host invites to do so, although this setting can be modified to allow a broader set of individuals to speak. Up to 13 people can speak in a Space at a given time.

23. Twitter also offers the ability to sign into third-party apps and websites using one's Twitter account. Typically, the third-party app or website will have a link that enables the user to sign into the third-party service using their Twitter account. Doing so grants the third-party service access to the Twitter user's account. Depending on the authorizations the Twitter user gives to the third-party service, the third-party service may be able to read the user's Tweets, see who the user follows on Twitter, post Tweets to the user's profile, or access the user's email address. A user can revoke a third-party app or website's authorization to access their Twitter account and associated data at any time.

24. X Corp. collects and retains information about a user's use of the Twitter service, to include: (1) content of and metadata relating to Tweets and DMs; (2) photos, images, and videos that are shared via Twitter and stored in the user's Media Timeline; (3) the identity of the accounts that a user follows and the accounts that follow the user's account; (4) the content uploaded to a user's profile page, including their avatar, banner image, and bio; (5) information about Tweets the account has liked; (6) information about Lists associated with the account; (7) information about the Spaces that a user has participated in, including the host of the Space, its start and

end times, and information about other attendees; and (8) applications that are connected to the Twitter account. X Corp. also collects and retains various other data about a user and his/her activity, including:

a.      logs of Internet Protocol ("IP") addresses used to login to Twitter and the timestamp associated with such logins;

b.      transactional records reflecting, for example, when a user changed their display name or email address;

c.      the identities of accounts that are blocked or muted by the user; and

d.      information relating to mobile devices and/or web browsers used to access the account, including a Twitter-generated identifier called a UUID that is unique to a given device.

25.      In some cases, Twitter users may communicate directly with X Corp. about issues relating to their account, such as technical problems or complaints. Social networking providers like X Corp. typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. X Corp. may also suspend a particular user for breaching X. Corp.'s terms of service, during which time the Twitter user will be prevented from using Twitter's services.

26.      Additionally, providers of electronic communications services and remote computing services often collect and retain user-agent information from their users. A

user agent string identifies, among other things, the browser being used, its version number, and details about the computer system used, such as operating system and version. Using this information, the web server can provide content that is tailored to the computer user's browser and operating system.

27.     In my training and experience, evidence of who was using a Twitter account and from where, and evidence related to criminal activity of the kind described herein, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

28.     Based on my training and experience, DMs, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Twitter account may provide direct evidence of the offenses under investigation and can also lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

29.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by X Corp. can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, documents, and photos and videos (and the

data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time. Similarly, device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

30.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31.     Other information connected to the use of an account may lead to the discovery of additional evidence. For example, accounts are often assigned or associated with additional identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities. This information may help establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

32.     Therefore, X Corp.'s servers are likely to contain stored electronic communications and information concerning subscribers and their use of Twitter. In my training and experience, such information may constitute evidence of the crimes

under investigation including information that can be used to identify the account's user or users.

33.     In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of X Corp., to protect the rights of the subjects of the investigation and to effectively pursue this investigation, authority is sought to allow X Corp. to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A.

## II.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNT

### A.     Summary and Background of Investigation

34.     According to Victim 1, Victim 1 was familiar with a renowned investment advisor named Lawrence Lepard who posted about investments on Twitter with the username "@lawrencelepard." On or about April 27, 2022, Victim 1 received a Twitter DM from an individual purporting to be Lepard. Specifically, the Lepard impersonator used a slightly different username, "@liawrencelepard" (**Subject Account 1**)—which was identical to Lepard's Twitter username except for the inclusion of an "i" after the initial "l". According to Victim 1, she did not notice that the account was different from Lepard's actual account, so she believed that the DM was from Lepard himself. During

this investigation, I interviewed Lepard, who confirmed that he was unaware of **Subject Account 1**.

35.     In a series of DMs sent that same day from **Subject Account 1** to Victim 1, the Lepard impersonator convinced Victim 1 to begin "investing" in the cryptocurrency Bitcoin. Those DMs instructed Victim 1: (1) to create an investment account at a website, "www.bondsea.com;" (2) to purchase Bitcoins through cryptocurrency exchanges; and (3) to send the purchased Bitcoins to a Bitcoin wallet purported to be Victim 1's investment account. Consequently, through approximately December 2022, Victim 1 sent approximately $105,000 worth of Bitcoins to that wallet because she believed the Lepard impersonator was profitably trading those Bitcoins on her behalf. More specifically, the Bondsea website purported to show that Victim 1's Bitcoins were being traded on a daily or near daily basis, generating investment returns.[2]

36.     By January of 2023, Victim 1's purported total account value had risen to approximately $1,139,000 based on those purported trades. In fact, a blockchain analysis conducted by an FBI forensic accountant showed that Victim 1's purported investment account wallet had been emptied on a rolling basis whenever Victim 1

_____

[2] Victim 1 provided law enforcement with a series of screenshots documenting certain of her Twitter DM conversation with the Lepard impersonator. However, the initial portions of the conversations only show Victim 1's statements, and not the statements of the account user. As described below, the Lepard impersonator later instructed Victim 1 to communicate using WHATSAPP, and Victim 1 provided law enforcement with screenshots, downloaded text files, and logs of her conversations with the Lepard impersonator on WHATSAPP. Victim 1 also provided law enforcement with screenshots of certain of the websites that purported to show her account balance at various times and certain of the trades executed on her behalf.

deposited Bitcoins, that no trades were being done, and that the wallet carried no balance.

**B.    Subject Account 1's Impersonation of Lepard**

37.     According to the real Lawrence Lepard, he is a registered investment advisor in Massachusetts. As reflected on his online Twitter account, Lepard often tweets about investment issues using an account with the username "@lawrencelepard" and the display name "Lawrence Lepard." Based on my review of that account, Lepard has approximately 144,000 followers. As shown below, his Twitter account (as of July 12, 2023) has a picture of himself and the tagline "fix the money, fix the world," as well as the description, "Investment Manager, Equity Management Associates, LLC. Sound money advocate. Gold stock fund manager. Austrian economist. Anti-Federalist. CrossFit Athlete. #BTC":



38.     On or about April 27, 2022, Victim 1 was contacted by **Subject Account 1** via Twitter DM. According to Victim 1, she had recently viewed an online video of a financial program in which Lepard was interviewed, after which she posted comments on that website, began following Lepard on Twitter, and exchanged emails with Lepard using the email address on Lepard's investment fund web site. Consequently, when she received the DM from **Subject Account 1,** Victim 1 believed that the author of those DMs was the real Lepard.  Additionally, **Subject Account 1** duplicated the real Lepard account by using the same photograph of Lepard, the display name "Lawrence Lepard," and the phrase "fix the money, fix the world," as well as the same description of Lepard. In reality, **Subject Account 1** was an entirely different Twitter account with the username "@liawrencelepard." Based on my review of that account online, **Subject Account 1** had no followers. In an interview with law enforcement, Lepard confirmed that he did not use and was not aware of the Twitter account with the username "@liawrencelepard."

39.     According to records provided by Twitter, **Subject Account 1** was activated on or about August 3, 2010, and assigned ID Number is 174392125. The telephone number associated with that account has a Nigerian country code.

**C.     The Lepard Impersonator's Instructions to Victim 1**

40.     According to Victim 1, after receiving the initial DM from **Subject Account 1**, the Lepard impersonator convinced her to trade Bitcoin using the website "www.bondsea.com." Specifically, the Lepard impersonator instructed Victim 1 to

access Bondsea and create an account. The impersonator further instructed her to purchase Bitcoins on cryptocurrency exchanges Coinbase and/or Crypto.com. Once purchased, the impersonator instructed Victim 1 to send those Bitcoins to a Bitcoin wallet with an address ending in vvf94z, which the impersonator stated would be Victim 1's investment account. According to Victim 1, the impersonator stated that he would then trade those Bitcoins on her behalf.

41.     According to Victim 1, she followed those instructions. Specifically, on or about April 27, 2022, she initially sent $988.89 worth of Bitcoins to that wallet, and she then sent a screenshot of that transaction to **Subject Account 1**.

42.     On or about that same day, according to Victim 1, the Lepard impersonator sent her another DM from **Subject Account 1** instructing her to download the communication application WHATSAPP. The impersonator also provided his WHATSAPP phone number, (xxx) xxx-6166, and instructed Victim 1 to communicate with him using WHATSAPP instead of Twitter DM. Consequently, except for a few more Twitter DMs on or about April 28, 2022, Victim 1 thereafter communicated with the impersonator using WHATSAPP.

43.     On or about April 28, 2022, according to Victim 1, the Lepard impersonator sent her a message via WHATSAPP containing a "trading plan," a screenshot of which she provided to law enforcement. That plan purports to show the "% Daily Earning Rate on equity," which would be dependent on the amount of money Victim 1 invested. According to that plan, a "STARTER" level investment of $1,000-

$5,000 corresponded to a purported daily earning rate of 20%; a "GOLD" level investment of $10,000-$49,000 corresponded to a purported daily earning rate of 50%; and a "DIAMOND (VIP)" level investment of at least $50,000 corresponded to a purported daily earning rate of 70%. The impersonator claimed that based on those rates, Victim 1 could earn five times her investment in a short period of time.

### D. Purported Trading and Gains in Victim 1's Account

44. Also on or about April 28, 2022, which was one day after Victim 1's initial transfer of $988.89 in Bitcoins to her purported investment account, the Bondsea website showed that the account had made $230.36 in profit.

45. According to Victim 1, believing that she was receiving investment advice from the real Lepard, she continued to purchase and send Bitcoins to the bitcoin wallet that she believed was her investment account. Victim 1's Bondsea account purported to show trades being done for her benefit on an almost daily basis, which trades purported to result in additional profits, as reflected in the following screenshot Victim 1 provided to law enforcement:



46.     Also as reflected in the following screenshot that Victim 1 provided to law enforcement, the Bondsea "trading dashboard" purported to show the increasing value of her account over time, such that Victim 1's account had purportedly made $3,847.48 in trading profits on a $10,027 investment by May 15, 2022:



47.     According to a blockchain analysis by an FBI forensic accountant, from April 28, 2022, to December 21, 2022, Victim 1 transferred at least 4.96 Bitcoins, worth approximately $110,979, into the Bitcoin wallet controlled by the Lepard impersonator.

48.     On or about December 29, 2022, the impersonator sent a WHATSAPP message to Victim 1 stating that there were problems with the Bondsea website, and that Victim 1 thus needed to create a new account on a new website, "www.iqtradeplus.com." According to Victim 1, she viewed that new website and saw that it contained numerous grammatical errors. She nevertheless created an account on that website so that she could view her account balance, which reflected that her purported balance was $1,139,261.

49.     On or about January 4, 2023, according to Victim 1 and downloaded WHATSAPP text files provided to law enforcement, Victim 1 started asking the Lepard

impersonator how to withdraw some of her money, including by saying that she wanted to withdraw $110,000 in part to pay a relative's tuition. The impersonator initially responded by trying to convince Victim 1 not to withdraw her funds, but later stated that she could withdraw that money. However, on or about January 13, 2023, she received the following email from the iqtradeplus website stating that there would be a "withdrawal fee" of $41,724 that she would have to "purchase" before being allowed to withdraw her account balance:



50.    In subsequent WHATSAPP communications provided to law enforcement, the Lepard impersonator explained to Victim 1 that she had to pay the fee prior to getting her money back. Victim 1 responded that she could not afford to pay that much, and the impersonator asked how much she could afford and suggested that she borrow

money to pay the fee. Victim 1 thereupon contacted law enforcement to report the fraud scheme. As of August 8, 2023, Victim 1 has not successfully withdrawn any of the money she sent to the Bondsea/Iqtradeplus Bitcoin wallet.

### E.    FBI Blockchain Analysis

51.    As part of the investigation, an FBI forensic accountant traced the flow of Bitcoins from the original wallet that was purported to be Victim 1's investment account. According to that analysis, there was no evidence that Victim 1's Bitcoins were traded for any profit, and no profits were added to the wallet. In fact, the analysis showed that the wallet did not carry a balance, in contrast to what was shown on the Bondsea website, and that none of the purported trades occurred. Instead, the wallet owner transferred all the Bitcoins out of the wallet on a rolling basis, and the wallet was empty as of May 26, 2023, with no additional funds transferred into the wallet. The majority of the Bitcoins were transferred from the original wallet to two wallets hosted by cryptocurrency exchanges Kucoin and Binance and to four wallets hosted by the Nigerian cryptocurrency exchange Busha. According to records provided by Binance and Busha, those wallets are owned by individuals in, respectively, Malta and Nigeria.

### F.    Other Potential Victims

52.    Based on my training and experience, the training and experience of other agents with whom I have consulted, and the complexity and ongoing nature of the above-described scheme to defraud, it is likely that other unidentified victims have

been and/or are being targeted by the same perpetrator(s) using **Subject Account 1** over some unknown but extended period of time. In fact, as detailed above, that account was first activated in 2010. Therefore, there is probable cause to believe that the information requested in the Search Warrant Application for a period of time from April 27, 2021 (*i.e.*, approximately one year before Victim 1 was first contacted by **Subject Account 1**) to the present will constitute evidence of other victims of the perpetrator(s) scheme to defraud, including evidence identifying such other victims.

## III.    SEARCH PROCEDURE

53.    In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of X Corp. to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.    The search warrant will be presented to X Corp. personnel who will be directed to the information described in Section II of Attachment A;

b.    In order to minimize any disruption of computer service to innocent third parties, X Corp. employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein;

54.     X Corp. employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

55.     Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from X Corp. employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

## IV.     CONCLUSION

56.     Based on the above information, I respectfully submit that there is probable cause to believe that evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 are located within one or more computers and/or servers found at X Corp., headquartered at 1355 Market Street, Suite 900, San Francisco, California 94103. By this affidavit and application, I request that the Court issue a search warrant directed to X Corp. allowing agents to seize the electronic evidence and other information stored on the X Corp. servers following the search procedure described in Attachment A and the Addendum to Attachment A.

FURTHER AFFIANT SAYETH NOT.


Keith Hennings
Special Agent
Federal Bureau of Investigation


Sworn to and affirmed by telephone
This 23rd day of August, 2023

Honorable Jeffrey I. Cummings
United States Magistrate Judge

# ATTACHMENT A

## I.   SEARCH PROCEDURE

1.   The search warrant will be presented to X Corp. personnel, who will be directed to isolate those accounts and files described in Section II below.

2.   In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.   X Corp. employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant.

4.   Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

## II.   FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF X CORP.

1.   This warrant applies to information associated with Twitter Account ID 174392125; Username @liawrencelepard ("**Subject Account 1**" or the "Account") that is stored at premises owned, maintained, controlled, or operated by X Corp., a company headquartered at 1355 Market Street, Suite 900, San Francisco, CA.

2. To the extent that the information described herein is within the possession, custody, or control of X Corp., regardless of whether such information is located within or outside of the United States, and including any communications, records, files, logs, or information that has been deleted but is still available to X Corp., or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 1, 2023, X Corp. is required to disclose to the government for the Account:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Identity and contact information (past and current), including full name, e-mail address, physical address, date of birth, phone number, gender, and other personal identifiers;

2. All usernames (past and current) and the date and time each username was active, all associated accounts (including those linked by machine cookie, IP address, email address, or any other account or device identifier), and all records or other information about connections with third-party websites and mobile apps (whether active, expired, or removed);

3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers;

7. Privacy and account settings, including change history; and

8. Communications between X. Corp. and any person regarding the account, including contacts with support services and records of actions taken;

B. For the period of time from April 27, 2021, through the present, all content, records, and other information relating to communications sent from or received by the Account, including but not limited to:

1. The content of all Tweets created, drafted, favorited/liked, or retweeted by the Account, and all associated multimedia, metadata, and logs;

2. The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the Account, including all attachments, multimedia, header information, metadata, and logs;

C. For the period of time from April 27, 2021, through the present, all other content, records, and other information relating to all other interactions between the Account and other Twitter users, including but not limited to:

1. All users the Account has followed, unfollowed, muted, unmuted, blocked, or unblocked, and all users who have followed, unfollowed, muted, unmuted, blocked, or unblocked the Account;

2. All information from the "Connect" or "Notifications" tab for the account, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as all tweets that include the username associated with the account (i.e., "mentions" or "replies");

3. All contacts and related sync information; and

4. All associated logs and metadata;

D. For the period of time from April 27, 2021, through the present, all other content, records, and other information relating to the use of the Account, including but not limited to:

1. All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

2. All multimedia uploaded to, or otherwise associated with, the Account;

3. All records of searches performed by the Account;

4. All location information, including all location data collected by any plugins, widgets, or the "Tweet With Location" service; and

5. All information about the Account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the Account was clicked.

3. Pursuant to 18 U.S.C. § 2703(d), the service provider is hereby ordered to disclose the above information to the government within 14 days of the signing of this warrant.

## III. Information to be Seized by Law Enforcement Personnel

For the period of time from April 27, 2021, through the present, all information described above in Section II that constitutes evidence and instrumentalities concerning violations of Title 18, United States Code, Section 1343, including information pertaining to the following matters:

1. Solicitations and communications concerning purported investments in cryptocurrencies.

2. Purported trading in cryptocurrencies.

3. The impersonation of investment advisors and/or other Twitter users.

4. The identity of the user or users of **Subject Account 1**.

5. The physical location of the users of **Subject Account 1**.

6. The identities and contact information of participants in, witnesses to, or victims of the **Subject Offenses**.

7.     The identity of persons who communicated with **Subject Account 1** concerning the **Subject Offenses**.

8.     Evidence indicating how and when **Subject Account 1** was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the **Subject Offenses** and to **Subject Account 1's** account owner.

9.     Evidence indicating **Subject Account 1's** account owner's state of mind as it relates to the **Subject Offenses**.

10.     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

# ADDENDUM TO ATTACHMENT A

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant requires the recipient of the warrant to copy and produce the contents of an electronic account so that they may be reviewed in a secure environment for information consistent with the warrant.

The account provider shall provide the government only data that fall within the criteria as described in Attachment A(II), which may either be the entire contents of an account or only a subset of an account.

The government's review of the data shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate only those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment A(III).

The review of electronically stored information contained in the account described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures that minimize the review of information not within the list of items to be seized as set forth in Attachment A(III):

a. examination of categories of data contained in the account to determine whether that data falls within the items to be seized as set forth in Attachment A(III);

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment A(III);

c surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment A(III);

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment A(III); and

6

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment A(III).

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment A(III). To the extent that materials produced by the account provider pursuant to this search warrant contain evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

known to investigators, the identities of witnesses, and the investigative strategy. For the foregoing reasons, the government respectfully requests that the Search Warrant Materials be sealed for 180 days from the date of this Order, until February 19, 2024, except as necessary to facilitate the enforcement of criminal law, including the execution of the search warrant, or to any federal official to assist the official receiving the information in the performance of that official's duties.

In addition, X Corp is a provider of an electronic communication service, as defined in Title 18, United States Code, Section 2510(15), and/or a remote computer service, as defined in Title 18, United States Code, Section 2711(2). Pursuant to 18 U.S.C. § 2703(b)(1)(A) and (c)(3), the government is not required to provide notice of the warrant to the subscriber or customer of the account.

Furthermore, under Title 18, United States Code, Section 2705(b), if the Court determines that that "there is reason to believe that notification of the existence of the warrant will result in—(1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation," this Court shall issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant. . . is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order."

In this case, such an order would be appropriate because the warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence or content of the warrant may cause flight from prosecution, the destruction of or tampering with evidence, the intimidation of potential witnesses, and otherwise seriously jeopardize the investigation. *See* 18 U.S.C. § 2705(b).

The United States respectfully requests that the Court issue an order commanding X Corp not to disclose the existence or content of the warrant to any person, until the warrant is unsealed by this Court, except that X Corp may disclose the warrant to an attorney for X Corp for the purpose of receiving legal advice.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: _____*/s/ Corey B. Rubenstin*_____
Corey B. Rubenstein
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-8880

DATE: August 23, 2023

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of the Search of:

The X Corp. account Twitter Account ID
174392125; Username @liawrencelepard,
further described in Attachment A

Case No. ___ M _____

Ref. No. 2023R231

**UNDER SEAL**

## ORDER

The UNITED STATES OF AMERICA by its attorney, MORRIS PASQUAL,
Acting United States Attorney for the Northern District of Illinois, having moved this
Court to Seal the Search Warrant, Application, and Affidavit (collectively, the "Search
Warrant Materials"), and having demonstrated good cause in support of its motion,
specifically, that disclosure of the Search Warrant Materials would jeopardize the
investigation by providing the subject of the investigation an opportunity to destroy
evidence or flee and jeopardize the investigation by disclosing the details of facts
known to investigators, the identities of witnesses, and the investigative strategy.

IT IS HEREBY ORDERED THAT the Search Warrant Materials be kept under
seal for 180 days from the date of this Order, until February 23, 2024, or until further
order of the court, which may include extensions of the seal upon a showing of good
cause.

THE COURT FURTHER FINDS that there is reason to believe that notification
of the existence of the warrant will seriously jeopardize the investigation, including by
causing flight from prosecution, causing the destruction of or tampering with evidence,